UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MIRA INTERNATIONAL FOODS INC.,

                  Plaintiff,

      vs.

NILE COMPANY FOR FOOD INDUSTRIES,

               Defendant.

08 Civ. 5825 (GBD)

---

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

---

NABLI & ASSOCIATES, P.C.
Attorneys at Law
60 East 42nd Street
Suite 1338
New York, NY 10165
(212) 808-0716

*Attorneys for Defendant
Nile for Food Industries*

## PRELIMINARY STATEMENT

Defendant Nile Company for Food Industries (hereinafter "Nile" or "Defendant") respectfully submits this memorandum of law in opposition to Plaintiff's motion for a preliminary injunction. The injunction sought by plaintiff's would enjoin Defendant from, *inter alia*, raising its prices (even though Defendant's prices were raised in accordance with the terms of the parties' agreement and the increased prices are in line with prevailing prices) and terminating the agreement between the parties (even though Plaintiff owes Defendant over $1 million and, thus, Defendant terminated the agreement between the parties in accordance with the contract's termination clause).

It is clear why Plaintiff proceeded *ex parte* in this matter, not permitting Defendant to be heard. We respectfully submit that had Plaintiff contacted Defendant, and had this Court been provided the full truth regarding Plaintiff's bogus allegations, the temporary restraining order never would have been issued.

For all the reasons discussed in detail below, Plaintiff's application should be dismissed with prejudice.

2

**STATEMENT OF FACTS**

For a complete statement of the relevant facts, the Court is respectfully referred to the accompanying Declaration of Waleed El Shirbini, sworn to on July 3, 2008. As set forth therein (and in the exhibits annexed hereto): (a) this *ex parte* application was brought to pressure Defendant into paying Plaintiff millions of dollars to buy Plaintiff out of a contract that has already been terminated pursuant to its terms; (b) Plaintiff is attempting an end run around the contract's arbitration provision; (c) Plaintiff has been buying his products from other suppliers for years, with eviscerates Plaintiff's claim that it will be irreparably harmed if this Court denies its request for injunctive relief; (d) Plaintiff's motion is premised upon misstatements, mischaracterizations, and falsehoods; and (e) Plaintiff has acted in bad faith, thus precluding it from seeking equitable relief from this court.

## ARGUMENT

A preliminary injunction "is one of the most drastic tools in the arsenal of judicial remedies." See *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985). Such an injunction thus "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." See *Moore v. Consol. Edison Co. of N. Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)); see also *Grand River Enterprise Six Nations, Ltd. v. Pryor*, No. 06-2747 CV, 2007 WL 662919, at *1 (2d Cir. March 6, 2007). To obtain a preliminary injunction, a plaintiff must show (1) irreparable harm and (2) either (a) a likelihood of success on the merits or (b) the existence of sufficiently serious questions on the merits to make them a fair ground for litigation, combined with a balance of hardships tipping decidedly in its favor. See *Reuters Ltd. v. United Press Int'1, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990)(citing *Coca-Cola Co. v. Tropicana Prods., Inc.*, 690 F.2d 312, 314-15 (2d Cir. 1982)); *Polymer Tech. Corp. v. Mimran*, 37 F.3d 74, 77-78 (2d Cir. 1994). Plaintiff's arguments fall woefully short of meeting this standard.

## I.   PLAINTIFF HAS NOT SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS.

Plaintiff has failed to carry its burden to prove likelihood of success on the merits. Rather than meeting this heavy burden, Plaintiff's motion is premised upon numerous misstatements, mischaracterizations, and falsehoods.

For example, Plaintiff alleges that Defendant was actively soliciting North American customers when Defendant attended a trade show in New York City this week. Mark Awadalla Dec., ¶¶ 52 - 57. In fact, the trade show that Defendant participated in this week on behalf of Defendant was attended by potential customers from all over the world. Elsherbini Dec. ¶25. For example, while at the trade show, Defendant's representative spoke to potential customers from (among other places) China and the

4

Dominican Republic (2 countries that are not covered by Plaintiff's exclusive distributorship agreement). *Id.* at ¶ 26. Of course, nothing contained in the parties' agreement precludes Defendant from attending trade shows.

Plaintiff also alleges that Defendant breached the subject agreement by: (a) failing to enter into good faith arms-length negotiations prior to increasing Defendant's prices; (b) "unilaterally and abruptly" imposing a 25 percent price increase in March 2008; and (c) charging "well above industry pricing for similar product." Mark Awadalla Dec., ¶¶ 59 - 64. These 3 statements are blatantly false. Upon information and belief, Mr. Awadalla is an attorney and, as such, is an officer of the court who is expected to ensure that: (a) his statements are true; and (b) in the context of this *ex parte* application, he presented all of the relevant facts to this Court (which he failed to do, as set forth in detail in the accompanying declaration of Waleed Shirbini).

First, pursuant to the terms of the agreement, price increases do not become effective until 90 days after notice from Defendant to Plaintiff. Mark Awadalla Dec., Exhibit "A" at ¶ 3.01. Thus, it would have been impossible for Defendant to have "abruptly" increased its prices.

Second, as required by the agreement, the parties entered into good faith negotiations during the 90 days following the notice of price increase. Annexed to the Elsherbini Declaration as Exhibit "E" is an email from Defendant to Plaintiff, dated December 9, 2007, notifying Plaintiff of the price increase. Although this email erroneously stated that the price increase would be effective January 1, 2008, Defendant subsequently advised Plaintiff that the price increase would not be effective until 90 days after the notice of price increase was sent. Elsherbini Dec. ¶29. Collectively annexed to the Elsherbini Declaration as Exhibit "F" are the email messages between Plaintiff and Defendant that constitute their good faith negotiations regarding the notice of price increase. As part of said negotiations, Defendant provided Plaintiff with Defendant's cost information (at Plaintiff's request) even though providing such

information was not required by the terms of the contract (Defendant's cost information has been removed from Exhibit "F" due to its confidential and proprietary nature). *Id.* at ¶ 30. Thus, there was no basis to allege that the price increase was "unilateral" or that Defendant failed to participate in the required good faith negotiations prior to the effective date of the price increase.

Third, the Declaration fails to provide any evidence in support of its bald and conclusory allegation that Defendant is charging "exorbitant" prices "well above industry pricing for similar product." Mark Awadalla Dec., ¶ 64. Such evidence, if it existed, would have been easily accessible to Mark Adawalla, given his years of experience in the juice and nectar industry (and his admissions, discussed above, that Defendant regularly purchases products from other suppliers). *Id.* at ¶ 31. In fact, the prices that Defendant alleges are well above industry pricing are in line with the prevailing prices in Egypt, as required by the terms of the agreement. Annexed to the Elsherbini Declaration as Exhibit "G" is a spreadsheet that Mr. Elsherbini prepared showing the prevailing prices in Egypt and the prices for Plaintiff (after the price increase).

Although Plaintiff concedes (Mark Awadalla Dec., ¶ 61) that Defendant's prices "had not changed for quite some time," Plaintiff fails to advise the Court that: (a) in the ten years since the execution of the contract, there had not been any material price increases; (b) during the same period, the Egyptian Pound's value was cut in half; (c) during the same period, inflation in the United States of America was more that 25% (2.5% per year for 10 years); and (d) during the same period, the cost of Defendant's raw materials increased by more than 50%. *Id.* at ¶ 33.

Plaintiff also alleges that Defendant is "actively soliciting quotations from companies who may be interested in importing Nectars into the United States." Mark Awadalla Dec., ¶ 51. Plaintiff draws this conclusion based upon the fact that he was able to select "United States" as the "Destination

6

Country" on Defendant's website. *Id.* However, Defendant requires prospective customers to identify destination countries so that it will not sell its products in violation of exclusivity agreements that Defendant has entered into (including, but not limited to, Defendant's agreement with Plaintiff). *Id.* at ¶ 35.

In addition to the above-described inaccuracies, misstatements, and falsehoods, the Declaration of Mark Adawalla is internally inconsistent.  Specifically, when he wants to argue that the subject contract was a valuable asset of the Defendant (e.g., when he attempts to explain why Defendant would agree to extend the term of the subject agreement from 10 years to 25 years in exchange for no consideration), he does so.  Mark Awadalla Dec., ¶ 24.  However, when he wants to argue that the subject contract was a significant liability of the Defendant (e.g., when he attempts to explain why Defendant would have initiated discussions regarding Defendant buying Plaintiff out of the agreement), he does so (even though this is in direct conflict with his previous argument).  Mark Awadalla Dec., ¶¶ 35, 66 - 67.

Based upon the foregoing, since Plaintiff has not shown a likelihood of succeeding on the merits, his application for injunctive relief should be denied.

## II.    PLAINTIFF IS UNABLE TO DEMONSTRATE IRREPARABLE HARM.

To justify the harsh remedy of a preliminary injunction, Plaintiff also must demonstrate that it will suffer irreparable injury if the injunction does not issue.  "Irreparable harm must be shown by the moving party to be imminent and not remote or speculative ... and the alleged injury must be one incapable of being fully remedied by monetary damages." *Reuters Ltd. v. United Press Int'l, Inc.,* 903 F.2d 904, 907 (2d Cir. 1990); *Loveridge v. Pendleton Woolen Mills, Inc.,* 788 F.2d 914, 917 (2d Cir. 1986) ("Irreparable injury means 'injury for which a monetary award cannot be adequate compensation.'")

(*quoting Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam)). Plaintiff has failed to make such a showing here.

Undeniably, the Second Circuit has defined the loss of an exclusive distributorship or the right to continue a flagship car dealership may constitute an irreparable harm, one that cannot be quantified in monetary terms. *Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co. of New York, Inc.*749 F.2d 124, 126 (2nd Cir. 1984); *Semmes Motors, Inc. v. Ford Motor Co.* 429 F.2d 1197, 1205 (2nd Cir. 1970). However, these cases (and the others cited by Plaintiff in support of its motion) are inapposite to the instant set of facts.

In this case, the business relationship between Mira and Nile is similar to the business relationships in *Roso-Lino* and *Semmes Motors* in that it is an exclusive distributorship. However, in *Roso-Lino* the distributor Plaintiff *only* distributed Coca Cola beverages and, in *Semmes Motors*, the distributor Plaintiff *only* sold Ford cars. In both these cases, the products are unique and exclusive to their manufacturers (and cannot be bought or sold elsewhere without a licensing agreement). Thus, the Coca Cola beverages and the Ford motors are fundamentally different than the juices and nectars bought by Mira from Nile.

Specifically, Mira does not sell Nile's products under the Nile name or trademark (in contrast to the *Roso-Lino* and *Semmes Motors* Distributor Plaintiffs, who earned their livelihood from *only* selling the Defendant Manufacturer's trademarked products). Elsherbini Dec., ¶¶ 17 – 21; Awadalla Dec., Exhibit "G.". In fact, the products that Nile manufactures for Mira are sold by Mira under the Mira trademarked name. Id. It is nothing more than what is known as private labeling (which is common in many different industries). Id. Moreover, Defendant has repeatedly conceded that Defendant's products are not unique. Elsherbini Dec., ¶¶ 19 – 21. Therefore, Plaintiff's reliance upon the *Roso-Lino* and *Semmes Motors* decisions is misplaced.

8

Plaintiff also relies upon the decision in *Travellers International AG v. Trans World Airlines, Inc.*, 684 F.Supp. 1206, 1216 (SDNY 1988). Plaintiff's Memorandum of Law, p. 6. However, in *Travellers International*, Defendant TWA sought to terminate a contract with Plaintiff Travellers International, the termination of which would have completely destroyed Plaintiff's business entity since Travellers International did 95% of its business **only** with Trans World Airlines. *Id.* Moreover, the Court in *Travellers International* enjoined the termination of the contract between the parties because Travellers neither had a "viable alternative to the TWA business," nor could it find "an adequate substitute for the current relationship with TWA." *Id* at 1216.

In contrast to the circumstances in *Travellers International*, the facts underlying the instant application do not amount to an irreparable harm. Specifically, Plaintiff herein has repeatedly conceded that it is purchasing products from suppliers other than Defendant. Elsherbini Dec., ¶¶ 19 – 21. All of these admissions by Plaintiff that it has used other suppliers are also admissions that Plaintiff has flagrantly breached the best efforts clause contained in the subject exclusivity agreement. *See* Mark Adawalla Dec. Exhibit "D" at ¶ 2.02.

Plaintiff also relies upon the decision in *National Kitchen Products, Inc. v. Kelmort Trading and Co.*, 1992 WL 18805 (SDNY Jan. 24, 1992). Plaintiff's Memorandum of Law, p. 6. However, as Plaintiff states in its memorandum of law, the Court in *National Kitchen Products* premised its holding upon the fact that the Plaintiff therein "was in full compliance of its obligation[s] under" the contract. *Id.* at p. 8. Nothing could be further from the truth in the instant action, since Plaintiff owes Defendant over $1 million in violation of the agreement's payment terms, has not complied with the arbitration provision of the agreement, has bought from other suppliers in violation of the agreement's best efforts clause, and unilaterally taken credits for alleged defective products that were later found by an independent inspector not to be defective. Elsherbini Dec., ¶¶ 4, 6 – 11, 19 – 22, 39 - 40.

Moreover, harm generally is not deemed to be "irreparable" where, as here, a plaintiff unduly delays seeking injunctive relief. See *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 39 (2d Cir. 1995) ("A district court should generally consider delay in assessing irreparable harm."); see also *Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.*, 25 F.3d 119, 124-25 (2d Cir. 1994); *Majorica, S.A. v. R.H. Macy & Co.*, 762 F.2d 7, 8 (2d Cir. 1985) (per curiam*); Citibank, N.A. v. Citytrust*, 756 F.2d 273, 277 (2d Cir. 1985); *Inflight Newspapers, Inc. v. Magazines In-Flight, Inc.*, 990 F. Supp. 119, 124 (E.D.N.Y. 1997) ("In the context of granting a preliminary injunction . . . the district court should generally consider delay in assessing irreparable harm.")(citation omitted).

Plaintiff's five month delay in seeking injunctive relief here belies any inference of irreparable harm. Indeed, Plaintiff knew on January 31, 2008 that Defendant intended to terminate the subject agreement in 120 days if Plaintiff did not comply with the agreement's payment terms. Elsherbini Dec. Exhibit "B." Yet despite being armed with all of this notice, Plaintiff nonetheless waited five months to file an application for injunctive relief. Plaintiff has also been aware of the challenged price increase since December 9, 2007. Elsherbini Dec. Exhibit "E." However, Plaintiff provides no explanation as to why it has taken it over six months to raise this issue with this Court (or an arbitrator, as required by the terms of the parties' agreement). Elsherbini Dec., ¶¶ 6 – 10.

While a plaintiff's delay in seeking injunctive relief "may not warrant the denial of ultimate relief, it may, standing alone, preclude the granting of preliminary injunctive relief, because the failure to act sooner undercuts the sense of urgency upon which the availability of the remedy is predicated." *Gidotex, S.r.L. v. Campaniello Imports, Ltd.*, 13 F.Supp.2d 417 (SDNY 1998), quoting *Tough Traveler, Ltd. v. Outbound Products*, 60 F.3d 964, 968 (2d Cir.1995) (internal citations and quotation marks omitted)).

Because plaintiff cannot demonstrate irreparable harm, its request for a preliminary injunction should be denied and the TRO should be dissolved in full.

10

III.    **A BALANCING OF THE HARDSHIPS TIPS DECIDEDLY AGAINST A CONTINUING TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION.**

Preliminary relief also should be denied where "the harm to the defendant strongly outweigh[s] any benefit that the plaintiff . . . would have derived from the granting of such relief." *See Imperial Chem. Indus. Ltd. v. National Distillers & Chem.*, 354 F.2d 459, 461 (2d Cir. 1965) (citation omitted); *see also Echezona v. City of New York*, No. 97-7914, 1997 WL 624980, at *2 (2d Cir. Oct. 9, 1997); *MyWebGrocer, LLC v. Hometown Info, Inc.*, 375 F.3d 190, 194-95 (2d Cir. 2004) *KMW Int'l v. Chase Manhattan Bank, N.A.*, 606 F.2d 10, 17 (2d Cir. 1979); *Jack Kahn Music Co., Inc. v. Baldwin Piano & Organ Co.*, 604 F.2d 755, 764 (2d Cir. 1979); *Arco Fuel Oil Co. v. Atlantic Richfield Co.*, 427 F.2d 517, 519 (2d Cir. 1970). Here, the balancing of the harms tip decidedly against continuation of the TRO and/or the granting of a preliminary injunction.

Specifically, Plaintiff owes Defendant more than $1 million. Elsherbini Dec., ¶ 4. On the other hand, Plaintiff can get its products from other suppliers (and has been doing so for years). Elsherbini Dec., ¶¶ 19 – 21. Thus, the harm to Defendant if it is forced to continue shipping products to a deadbeat customer (at prices below prevailing rates) would be far greater than the benefit that Plaintiff would derive from the granting of such relief. Elsherbini Dec., ¶¶ 31 – 33. Based upon the foregoing, the requested injunctive relief should be denied.

IV.    **PLAINTIFF'S UNCLEAN HANDS BAR IT FROM SEEKING EQUITABLE RELIEF FROM THE COURT.**

It has been long settled that "one who has acted fraudulently, or who by deceit or any unfair means has gained an advantage" must be denied the equitable protections of the court, for he has unclean hands. *Keystone Driller Co. v. General Excavator Co.* 290 U.S. 240, 244, U.S. 1933. (quoting *Bein v. Heath*, 6 How. 228, 247, 12 L.Ed. 416; *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.* 324 U.S. 806, 814 (1945). Furthermore, in seeking the equitable protection of the Court, a litigant must not only demonstrate a true controversy, but must do so with clean hands, by being

"frank and fair with the court, [and] nothing about the case under consideration should be guarded, but everything that tends to a full and fair determination of the matters in controversy should be placed before the court.' " *Keystone Driller Co. v. General Excavator Co.* 290 U.S. 240, 244, U.S. 1933 (quoting Story's Equity Jurisprudence (14th Ed.) s 98.

In stark contrast to this demanding standard, Plaintiff's motion for a preliminary injunction is replete with misstatements, mischaracterizations, and falsehoods (as discussed in detail above). Elsherbini Dec., ¶¶ 24 – 38.  Moreover, during the course of the parties' business relationship, Plaintiff has taken bad faith actions (including, as discussed above, unilaterally taking credits for alleged defective products that have later been found by an independent inspector not to be defective). Elsherbini Dec., ¶¶ 39 – 43.

Based upon the foregoing, since Plaintiff comes to this Court with unclean hands, it should be denied the equitable relief that it seeks.

## V.    REQUIREMENT OF A BOND

For all the above reasons, the TRO should be immediately dissolved, and no preliminary injunction should issue in this matter.

In the event the court is inclined to grant this extraordinary relief, plaintiff should be required to post an undertaking in the amount of $1 million. *See* Elsherbini Dec., ¶ 4.

Pursuant to Fed. R. Civ. P. 65(c), a party seeking a temporary restraining order or preliminary injunction is required to post an undertaking.  The purpose and function of an undertaking is to reimburse the defendant for damages sustained if it is later finally determined that the preliminary injunction was erroneously granted.  *See Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 910 F.2d 1049, 1055 (2d Cir. 1990); *Little Tor Auto Ctr. v. Exxon Co.*, 822 F.Supp. 141, 144 (S.D.N.Y. 1993) ("Imposition of a bond requirement where appropriate both insures and limits recovery if significant risk

of harm to the enjoined party may be incurred. The injunction bond insures that funds will be available to compensate a party improvidently enjoined at the behest of the party posting the bond.").

The posting of an undertaking is mandatory – both for a temporary restraining order and for a preliminary injunction.  *See* Fed. R. Civ. P. 65(c) ("no restraining order or preliminary injunction shall issue except upon the giving of security by the applicant ....").  The bond requirement in Fed. R. Civ. P. 65 affords security for those damages proximately caused by the wrongful issuance of an injunction. *See International Equity Invs., Inc. v. Opportunity Equity Partners*, No 05 Civ 2745, 2006 WL 1116437, at *4 (S.D.N.Y. Apr. 12 2006).

The proposed preliminary injunction herein would force Defendant to continue to sell products to Plaintiff notwithstanding the fact that Plaintiff owes Defendant more than $1 million.  The resultant damages would be real, and not at all speculative.  In light of the above, defendants are requesting a bond of at least $1 million should the court keep the TRO in effect and/or issue a preliminary injunction.

### CONCLUSION

For the reasons set forth above, the TRO in this matter should be dissolved, plaintiff's application for a preliminary injunction should be denied in its entirety, plaintiff should be required to pay defendants' legal fees in full, and the Court should order such other and further relief as it deems just and proper.

Dated:          July 7, 2008
                New York, New York

Respectfully submitted,

NABLI & ASSOCIATES, P.C.

By:_____
Alan J. Harris (AH-8894), Of Counsel
60 East 42nd Street
Suite 1338
New York, NY 10165
(212) 808-0716

*Attorneys for Defendant*
*Nile for Food Industries*

14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MIRA INTERNATIONAL FOODS INC.,

Plaintiff,

vs.

NILE COMPANY FOR FOOD INDUSTRIES,

Defendant.

08 Civ 5825 (GBD)

**AFFIRMATION OF SERVICE**

Alan J. Harris, Esq., an attorney duly licensed and admitted to practice law before the courts of the State of New York, being duly sworn, deposes and says:

1. I am not a party to this action, am over 18 years of age and reside in the state of New York.

2. On the 7th Day of July, 2008, I served upon the following person via Email and First Class Mail a true and complete copy of Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction by leaving same in the exclusive custody of the United States Postal Service.

> Willard C. Shih, Esq.
> Wilentz, Goldman & Spitzer
> 90 Woodbridge Center Drive
> Suite 900, Box 10
> Woodbridge, NJ 07095
> Tel: (732) 636-8000
> Attorney for Plaintiff

Alan J. Harris, Esq.